IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JAMETRIUS MCCON, DARYL D. WILLIAMS,
LARRY HENDERSON and LAMARIO HENDERSON                PLAINTIFFS

VERSUS                                                CASE 1:17cv77-LG-RHW

ADOLFO PEREZ and D&D EXPRESS TRANSPORT CORP          DEFENDANTS

-AND-

D&D EXPRESS TRANSPORT CORP                            COUNTER-PLAINTIFF

VERSUS

DARYL D. WILLIAMS                                     COUNTER-DEFENDANT

### DESIGNATION OF EXPERT WITNESSES OF DEFENDANTS ADOLFO PEREZ AND D&D EXPRESS TRANSPORT CORP

**COME NOW**, the Defendants, Adolfo Perez and D&D Express Transport Corp (collectively referred to as "Defendants"), by and through their attorneys of record, Galloway, Johnson, Tompkins, Burr & Smith, who hereby designate their expert witnesses as follows:

1. William Messerschmidt, Messerschmidt Safety Consultants
   2148 Pelham Parkway, Building 100-B
   Pelham, AL 35124
   205-444-0071
   Designated Areas: Human Factors and Accident Reconstruction

Bill Messerschmidt may be called by Defendants as an expert in Human Factors and Accident Reconstruction. His CV/resume, fee schedule, publication list, and testimony list are being produced along with his signed expert report, all of which are incorporated herein by reference. The education, training and experience listed by Mr. Messerschmidt in his CV/resume support his qualification as an expert. Defendants incorporate herein by reference his signed expert report for a complete statement of his opinions and basis for same; however, Defendants provide the following summary:



Mr. Messerschmidt is expected to testify that, during the time when the Buick was coasting after losing power, it would have become easily apparent to a sober, attentive and prudent driver that he would not make it to his exit. At the time of impact, when Mr. Williams had slowed to between 7 and 13 mph, the Moss Point / Pascagoula exit was still well over one mile away, and Mr. Williams had not reached the first highway sign announcing the exit. In addition, the elevation of the bridge was sloping upward, which should have further cued Mr. Williams that he would not be able to continue coasting. A prudent and sober driver could easily have determined that the safe and legal course of action was to park his vehicle in the 12-foot emergency lane. Thus, the known actions of Mr. Williams were unsafe and imprudent. Mr. Williams had over 40 seconds to remove his disabled vehicle from the travel lane simply by steering into the emergency lane and continuing to roll eastward. Instead, Mr. Williams continued to operate the vehicle even as it slowed to a near stop, thereby causing an immediate hazard to any and all other traffic on I-10.

Mr. Messerschmidt is expected to testify that there are no visual occlusions that would have prevented Mr. Perez from seeing the Buick, but that does not mean he should have seen and perceived an immediate danger. Although the absolute line of sight was over 2000 feet, research and experience show us that drivers do not stare fixedly to the limit of the visual field. Commercial drivers are often taught to make glances at the roadway up to 15 seconds ahead of their vehicle. Based on Mr. Perez' speed, this would be approximately 1430 feet.

Mr. Messerschmidt is further expected to testify that, shortly after closing to within 1430 feet, Mr. Perez might be expected to notice the Buick, since it had entered his visual search area. This would have occurred approximately 24 seconds after the Buick began to coast and 21 seconds before impact. At this point, however, it is very unlikely that Mr. Perez would have been able to determine anything about the relative movement of the Buick. Applying the *Janssen, et.*

*al.* Model to Mr. Perez, the first point where the distance was small enough and speed was high enough for Mr. Perez to recognize that he was actually overtaking the Buick would have occurred approximately 27 seconds after the Buick ran out of gas or lost power, and approximately 18 seconds before impact.

Mr. Messerschmidt is expected to testify that, when the Buick lost power, the separation was approximately 1281 feet, and the closing speed between the vehicles was approximately 36 mph. Although Mr. Perez could have understood that he was traveling somewhat faster than the Buick, he would not have had sufficient visual information to determine the critical question: How much faster? Based on the increasing closing speed and decreasing headway between the vehicles, this occurred at a separation distance of approximately 406 feet, which was approximately 41 seconds after the Buick ran out of gas and 5 seconds before impact. At this point, the closing speed had increased (as the Buick slowed) to approximately 52 mph.

Mr. Messerschmidt looked at what, if any, threshold value elicited an emergency response from drivers and found that drivers responded predictably and quickly when the visual angle was increasing at a rate of 0.006 radians per second. Mr. Messerschmidt is expected to testify that several other researchers have undertaken this problem, and the threshold value described is quite close to the middle value of the most current research. This threshold distance is approximately 290 feet – a headway reached when the closing speed was approximately 53 mph, 41.5 seconds after the Buick ran out of gas and 3.5 seconds before impact. From this point, the average Perception – Response Time (PRT) (including air brake lag for the commercial vehicle) will be approximately 2.1 seconds, and the 85th percentile response time will be approximately 2.8 seconds. Based on the closing speed between the vehicles, the expected response distance, given this range of PRT, is 148 – 78 feet from impact. This is a similar distance to the skid marks that Trooper LaCap testified were present at the crash scene.

Mr. Messerschmidt is expected to testify that, based on the known circumstances of the collision, there is no evidence to support a conclusion that Mr. Perez was distracted or impaired by fatigue or any other circumstances. If the intervening SUV passed Mr. Perez in such a manner that it was more than 350 feet ahead of him when it took evasive action because of the Buick, then the skid marks described by Trooper LaCap place Mr. Perez' performance within the expected norm for all drivers. Because the location of this SUV is unknown, and cannot be known, the alternative circumstance must also be described: if Mr. Perez was following the SUV at a distance of 350 feet or fewer, then his braking response was up to two seconds longer than would be expected for an attentive driver.

Mr. Messerschmidt is further expected to testify that there are no scientific studies that support or address Gary Johnson's opinion that the Buick's headlight illumination on the bridge's concrete barriers would have provided a visual cue for helping Mr. Perez determine his closing speed. Problems associated with scaling relative velocity occur almost as easily under full daylight conditions, and therefore, the current state of the research does not support the idea that headlight spill onto the barriers would overwhelm or effectively supplement the visual angle cues. Additionally, Mr. Johnson's animation does not take into account the fact that the Buick's passenger-side headlight was not functioning as shown in Trooper LaCap's photograph.

Finally, Mr. Messerschmidt is expected to address Jon Paul Dillard's opinion that commercial drivers should be aware of their surroundings. First, all drivers should be aware of their surroundings. Second, the specific circumstances of this crash at times exceeded human perceptual and cognitive limitations. It is only possible for Mr. Perez (or any other driver, commercial, first responder, or citizen) to fail in a "duty" if that "duty" is possible for him or her to perform. Mr. Dillard makes the statement that a commercial driver must drive within the visibility distance of his or her headlights, and states that low beam headlights provide 250 feet

4

of visibility distance. If this were true, and an "average" night-time PRT was 2.0 seconds, commercial vehicles would be unable to lawfully travel faster than 42 mph.

Mr. Messerschmidt reserves the right to amend or supplement his opinions should further information be discovered or become available.

    2.    Shanon R. Burgess, Forensic Technician
           Messerschmidt Safety Consultants
           2148 Pelham Parkway, Building 100-B, Pelham, AL  35124
           205-444-0071
           Designated Area: Accident Reconstruction

Shanon Burgess may be called by Defendants as an expert in Accident Reconstruction. His CV/resume and fee schedule are being produced along with his signed expert report, all of which are incorporated herein by reference. He does not have any prior testimony or publications. The education, training and experience listed by Mr. Burgess in his CV/resume support his qualification as an expert. Defendants incorporate herein by reference his signed expert report for a complete statement of his opinions and basis for same; however, Defendants provide the following summary:

Mr. Burgess is expected to testify that, while the evidence confirms Mr. Williams' tail lights were on, there is insufficient evidence to conclude the hazard lights were on or not on. There are two types of tail lamp bulbs utilized in the Buick. One type is a single filament bulb used for tail lights, and the other type is a dual filament bulb used for turn signals, brake lights, and hazard lights. The single filament bulbs that were inspected showed signs of "hot shock," which indicates the filament was illuminated at the time of impact, and therefore, the tail lights were on. The dual filament bulbs that were inspected contain a thin wire and thick wire. The thin wire has a higher resistance to draw less current and give off less light, this wire is typically used for parking and tail lights. The thin wire filaments inspected showed signs of "hot shock," which again indicate they were incandescent at the time of impact such that the tail lights were on. The

thick wire has a lower resistance to draw more current and give off more light; this wire is typically used for turn signals, brake lights, and hazard lights. The thick wire filaments inspected did not show the same clear indication of "hot shock," but instead showed signs of bowing. Because both filaments are not equally deformed potentially indicates the thick wire filament was not incandescent at the time of impact and was hot because of it's proximity to the incandescent filament, and thus, there is not enough evidence at this time to determine the status of the hazard lights at the time of impact. Therefore, one cannot state to a reasonable degree of scientific probability that the hazard lights were on or not on at the time of the collision.

Mr. Burgess downloaded and photographed the 2008 Freightliner on June 15, 2016. He is expected to testify that the ECM had a slow clock drift of approximately 2 hours. The ECM had the governed maximum road speed parameter set at 75.06 mph and the maximum governed cruise speed set at 73.07 mph. This would have made it difficult for the Freightliner to reach speeds higher than the set parameters on a flat stretch of roadway, such as the section of I-10 where the collision occurred.

Mr. Burgess is expected to testify regarding the ECM monthly activity data for the last three months of driving prior to the collision. The April, May, and June months were all recorded, with the average speed between 56.2 and 62.6 mph. The monthly activity for April can be further broken down as percentage of driving time under 66 mph (53.94%), between 66-71 mph (21.48%) and over 71 mph (24.58%). Also, the Daily Engine Usage data from the month of May is consistent with the Monthly Activity in regard to average vehicle speed.

Mr. Burgess is further expected to testify regarding his calculations for approximate and closing speeds. According to Mississippi Highway Patrol photographs and testimony from Trooper LaCap, there were skid marks left by the Freightliner approximately the length of the tractor-trailer combination, but no measurements were taken. Assuming the tractor-trailer

measured approximately 70 feet long, the skid marks at the time of the collision would be similar. If the Freightliner was travelling between 60-65 mph (88-95.3 feet per second) as stated in Mr. Perez's deposition, the Freightliner would have begun braking 0.73-0.79 seconds before impact. Using a tire/roadway coefficient of friction of 0.4 would have slowed the Freightliner down to approximately 52-58 mph at impact.

Mr. Burgess is expected to testify that the closing speed at impact between the two vehicles was estimated by using crush stiffness coefficients and crush measurements applicable to the Buick. The coefficients were applied to the measurements of the approximate width and depth of the damage compared to published vehicle dimensions. Based on the analysis of the damage, the closing speed at impact was calculated to be approximately 45 mph. If the Freightliner was travelling between 52-58 mph, that would put the Buick's speed at impact between 7-13 mph. This is not consistent with Mr. Williams' response to interrogatories that they were travelling approximately 58 mph moments before impact, but it is consistent with McCon's medical records where he stated they were traveling no more than 10 mph.

Mr. Burgess is further expected to testify that, assuming Mr. Williams' vehicle was travelling approximately 58 mph when he experienced some type of mechanical failure and using a tire/roadway coefficient of friction of 0.05, it would have taken Mr. Williams approximately 46-41 seconds or 2216-2136 feet of rolling to reach the calculated impact speed of 7-13 mph. It would have taken Mr. Williams approximately 52 seconds or 2249 feet to come to a complete stop. This would have allowed a sufficient amount of time and distance for Mr. Williams to find a safe place to pull the Buick onto the shoulder of I-10. Additionally, according to the accident report, the collision occurred around mile marker 66 of I-10, and at this point, Mr. Williams was approximately 10,326 feet or 1.96 miles from the nearest exit. This is inconsistent with Mr. Williams response to interrogatories that they were coming up on their exit and would

7

have needed to slow down to take it. Based on the information, data, documents, and interrogatory responses, Mr. Williams would not have been able to reach his exit given the amount of distance away and the high-rise portion of the bridge he would have to overcome.

Mr. Burgess reserves the right to amend or supplement his opinions should further information be discovered or become available.

    3.    M. Brian Stout
           MBS Consulting
           P.O. Box 7466, D'Iberville, Ms. 39540
           877-268-7347
           Designated Areas: Commercial Trucking Regulatory Compliance, Safety, Training, and Federal Motor Carrier Safety Regulations

Brian Stout may be called by Defendants as an expert in Commercial Trucking Regulatory Compliance, Safety, Training, and Federal Motor Carrier Safety Regulations. His CV/resume, fee schedule, testimony list, and publication list are being produced along with his signed expert report, all of which are incorporated herein by reference. The education, training and experience listed by Mr. Stout in his CV/resume support his qualification as an expert. Defendants incorporate herein by reference his signed expert report for a complete statement of his opinions and basis for same; however, Defendants provide the following summary:

Mr. Stout is expected to testify that, according to FMCSA Regulation §391.11(b)(2), a driver must be able sufficiently read and speak English "...sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." The FMCSA regulations do not expound on the English language requirements any further than what is listed in §391.11(b)(2). According to a Motor Vehicle Record report issued on 02/25/16, Driver Perez obtained his Florida CDL Class A on 05/28/13, and he has endorsements of Hazmat and Tank. To obtain a CDL, the oral exams may be given in English or Spanish, with the exception of the

8

Hazmat endorsement, in which the oral exams may not be given in Spanish. Thus, Perez was required to communicate in English to obtain his Hazmat endorsement.

Mr. Stout is further expected to testify that a review of Driver Perez's Pre-Employment Screening Program Report (PSP) provided by the FMCSA revealed that Driver Perez had not been stopped or ticketed for violations in the past 36 months. There's no further enforcement evidence to suggest that Driver Perez was unable to communicate with official inquiries, weigh scales, or enforcement efforts which may not have been recorded in the federal system. Additionally, a review of Driver Perez's driver qualification packet shows a driver application written in English that appears to be completed and signed by Perez. Therefore, Driver Perez may be limited in his ability to speak English, but there's no evidence to conclude that he was unqualified to operate a CMV by either federal or Florida state standards based on an inability to communicate.

Mr. Stout is expected to testify that, according to FMCSA Regulation §382.303, a driver must obtain a post-accident drug and alcohol test under certain circumstances. If you reference the federal regulations regarding post-accident drug and alcohol testing with regard to the crash in question, it is clear no post-accident drug or alcohol tests were required because Driver Perez was not cited for cause and the crash did not involve a fatality. Therefore, D&D Express and Driver Perez were not in violation of the requirement of post-accident testing in accordance with §382.303.

Mr. Stout is also expected to testify that, according to FMCSA Regulation §395.8, a driver must maintain a Record of Duty Status for his/her previous seven days, produce it on request from an enforcement official, and this record must be maintained at the carrier for six months. Trooper LaCap is not assigned to the Motor Carrier Safety Assistance Program (MCSAP), which is the primary CMV investigating agency for Mississippi Highway Patrol.

Thus, even if the logbooks had been produced on the crash scene, there would be no definitive analysis by the Trooper. D&D Express was unable to produce the logbooks during discovery process. Although this is not in keeping with industry standard and best practices, it is common from Mr. Stout's experience in these circumstances for documentation to be misplaced during towing and scene clean up. The inability for a driver to produce log books on request from enforcement on the side of the road would be an Out of Service violation, but there is no evidence of that violation in this case. In this case, the inability to produce log books by D&D Express is not a Critical or Acute violation and does not give a complete picture of the records retention or hours of service culture at D&D Express. Therefore, there is no evidence that would suggest that Driver Perez was fatigued or operating out of legal driving hours.

Mr. Stout is further expected to address Mr. Dillard's opinion on the state of mind of Driver Perez, as well as the claim that Driver Perez "willfully" and "knowingly" violated safety regulations. Section 383 of the FMCSR was written in general to address CDL standardization among the states and standards in the testing and issuance of CDLs. It is primarily based on the endorsements, training, and skills of drivers as related to the issuance of driving privileges by the states and what criteria should be considered in the licensing and skills testing of CDL drivers. The claim that Driver Perez was in violation of §383.111 including (a)(7); (a)(9); (a)(10); and (a)(13) appears to be taken out of context when attempting to cite a violation of these due to the actions of a driver during a crash event. The inappropriate use of this section of the regulations is even further disputed if the CMV driver was faced with an emergency, arguably unusual circumstance. There is no evidence that suggests Driver Perez did not have "knowledge" of the correct procedures needed for a "proper visual search method" or "speed management" or "hazard perceptions," especially when considering that, according to Driver Perez's account, he did not strike the vehicle that was directly in front of him while in normal operation, but instead,

struck a vehicle that was revealed at a moment's notice after the vehicle in front of him swerved.

Mr. Stout is further expected to testify that the FMCSA recently announced its Crash Preventability Demonstration Program and has begun accepting challenges from motor carriers to crash data on the FMCSA's records. Regulations contained in 383.111 are not referenced in any part of this federal program's methodology. In Mr. Stout's experience of representing clients in hundreds of federal and state Safety Audits and Compliance Reviews, none of these sections have ever been cited by any state or federal officer as a basis for their decisions when determining whether a crash was preventable or not. Section 383.111 refers to the required driver's knowledge and not actions or performance outside of testing knowledge. The federal regulations do not claim anywhere in this area that drivers who may crash into the back of another vehicle, especially one disabled, are automatically in violation of these regulations. None of these regulations state any ratios, measurements, or distances to keep, and they are subject to subjective interpretation. Therefore, §383.111 related to Driver Perez's actions and knowledge at the time of the crash are taken out of context, are not applicable and are inappropriate to cite against him.

Mr. Stout reserves the right to amend or supplement his opinions should further information be discovered or become available.

4. Dr. Marland Dulaney, Jr. Ph.D. DABT
   Dulaney Toxicology, Inc.
   7133 Heritage Ridge Road · Tallahassee, Florida 32312
   (850) 668-0646
   Designated Area: Chemistry, Pharmacology, Toxicology, and Risk Assessment

Dr. Marland Dulaney may be called by Defendants as an expert in Chemistry, Pharmacology, Toxicology, and Risk Assessment. His CV/resume with his list of publications and list of cases, and his fee schedule are being produced along with his signed expert report, all of which are incorporated herein by reference. The education, training and experience listed by

11

Dr. Dulaney in his CV/resume support his qualification as an expert. Defendants incorporate herein by reference his signed expert report for a complete statement of his opinions and basis for same; however, Defendants provide the following summary:

Dr. Dulaney is expected to testify that, based on Daryl Williams' medical records, approximately two hours and fifty minutes after the time of the collision, a blood specimen from Mr. Williams was collected and sent to the laboratory for Alcohol Medical Blood analysis and Basic Metabolic Panel analysis. The Basic Metabolic Panel results were normal, but several components of the complete blood count white blood cell differential were abnormal. In addition, the Alcohol Medical Blood analysis indicated that Mr. Williams had a Blood Alcohol Concentration (actually serum alcohol concentration) of 57 mg/dL (0.057 g/L). Dr. Dulaney is expected to apply generally accepted scientific principles and calculations to opine on the probable Blood Alcohol Concentration (BAC) of Mr. Williams at the time of the collision and the affect of same on his actions.

Dr. Dulaney is expected to testify that most common use of alcohol is as a central nervous system (CNS) depressant. The pharmacokinetics of alcohol have been well known since the early part of the 20th century, and the disposition and fate of ethanol in the body has four distinct phases: absorption, distribution, equilibrium, and elimination. The plotting of BAC over time is called the Widmark Curve. Absorption is the passage of ethanol into the blood stream via the stomach and intestines; this is also referred to as the ascending part of the Widmark Curve. Distribution is the movement of ethanol from the blood stream into the water portion of the cells and organs. The absorption of alcohol into the body takes from 30 to 60 minutes based upon a number of factors, including but not limited to the presence of food and the type of alcohol consumed. Equilibrium is the balancing of ethanol concentration between the various portions of the body water. Elimination is the removal of ethanol from the body, predominantly via

metabolism, with a small amount of direct excretion into the expired air and urine. The elimination portion is the only part of the Widmark Curve where the practice known as "retrograde extrapolation" can be conducted, because it is the only portion of the curve that is linear. The slope of the linear portion of the Widmark Curve is called the Widmark beta factor.

Dr. Dulaney is expected to testify that retrograde extrapolation allows one to predict a BAC along the linear portion of the Widmark Curve based upon a later BAC measurement. Using this methodology, Mr. Williams' serum alcohol concentration at 0717 hours (57 mg/dL) was converted to a whole blood alcohol concentration using the well-known serum alcohol concentration/blood alcohol concentration ratio of 0.85. This methodology is commonly conducted in Emergency Rooms and used for forensic analysis of serum alcohol concentration. Using this well-established methodology, Dr. Dulaney is expected to testify that Mr. Williams' whole blood alcohol concentration (BAC) at 0717 was 45 mg/dL (0.045 g/dL), and retrograde extrapolating this BAC back to the time of the collision indicates that Mr. Williams' BAC ranged from 93.5 to 108.5 mg/dL (0.095 to 0.108 g/dL), using Widmark beta factors of 0.15 to 0.20 g-%/ml-hr, with an average value of 0.017g-%/ml-hr. These calculations indicate that Mr. Williams' BAC at the time of the collision was well above the legal concentration considered to cause driving impairment (0.08 g/dL), and thus, Mr. Williams was an impaired driver at the time of the collision.

Dr. Dulaney is further expected to testify that an alternative model for calculating BAC is the Dram Shop Alcohol Model, which takes into account age, body weight, Widmark rho factors calculated using anthropomorphic methodologies, and a range of Widmark beta factors from 0.015 – 0.020 g-%/ml–hour. Using this methodology, initial model calculations indicated that for Mr. Williams to have had a serum blood alcohol of 57 ng/mL (45.5 mg/mL BAC) at 0717 hours, he would have had between 3 and 4 "standard drinks" of alcohol in his system at the time of the

13

collision, resulting in a BAC of 0.109 to 0.104. Retrograde extrapolation values are slightly different from the Dram Shop Model values, because retrograde extrapolation is looking backward in time while the Dram Shop Model is looking forward in time.

Dr. Dulaney is further expected to testify that alcohol consumption impairs many different sensory and motor skills essential to operating any motor vehicle, and it does so in a dose-dependent fashion. Some people do not always demonstrate the typical signs and symptoms of impairment following alcohol consumption, particularly at lower BACs. These individuals have developed the ability to maintain an outward appearance of normality even though they are, in fact, impaired. This effect is called behavioral tolerance. In some situations, the tolerant individual can successfully mask impairment where even trained physicians and police alcohol recognition officers can fail to recognize impairment. However, behavioral tolerance is only an outward behavior correction – a learned response developed through long-term use of alcohol – but it has no effect on the chemical and neurological aspects of alcohol impairment. These people are impaired: they simply do not appear or act as if they are. When an unexpected event occurs, impairment becomes immediately obvious in even highly tolerant individuals, because their brains are under the effect of a depressant drug, which adversely impacts functions such as visual acuity, mental processing, and motor activity. They are, therefore, unable to evaluate and process the information associated with the unexpected new situation and react appropriately.

Dr. Dulaney is expected to testify that Mr. Williams was highly impaired at the time of the collision, as his BAC at the time of the collision was well above 0.08 g/dL, the BAC at which all drivers are believed to be impaired. At the time of the collision, Mr. Williams would have been in the Euphoria and/or the Excitement Stage of Alcoholic Influence or Intoxication. As such, his attention span and judgment would have been reduced, and his ability to process information would have been diminished. Perception, memory, and comprehension are also

adversely impacted at this stage. Mr. Williams' visual acuity would have been impaired, and his glare recovery would have been slowed. Such impairment helps explain why, when Mr. Williams' vehicle began to slow after the engine quit, he failed to move his vehicle into the emergency lane. At his level of intoxication, Mr. Williams may not have even realized that his car was slowing until the vehicle had come to a full or near full stop. Furthermore, a reasonable, unimpaired driver would immediately maneuver onto the emergency lane in such a situation. Dr. Dulaney is expected to testify that Mr. Williams was too impaired to realize he had run out of gas or had a mechanical failure, and that it is highly unlikely that Mr. Williams would have simultaneously been trying to re-start the car with one hand and reaching to turn on his emergency flashers with the other, especially given Mr. Williams may not have even been aware that he needed to do so.

Dr. Dulaney is expected to testify that, when an emergency situation occurred, Mr. Williams was unable react appropriately and move his vehicle into the emergency lane due to his level of intoxication. Mr. Williams' BAC would have prevented him from understanding his situation when his vehicle ran out of gas or lost power and from taking the prudent action of moving his car into the emergency lane. His failure to process information correctly and react appropriately due to his high BAC was the proximal cause of the collision. Mr. Williams also showed poor judgment when he chose to drive with a suspended drivers' license and failed to maintain his vehicle. In addition, since Mr. Williams was in the Excitement Stage of Acute Alcoholic Influence or Intoxication, it is probable that his perception, memory, and comprehension of the events that occurred that morning are suspect.

Finally, Dr. Dulaney is expected to testify that the gentlemen riding along with Mr. Williams – Lamario Henderson, Larry Henderson, and Jametrius McCon – also showed poor judgment when they chose to ride with a highly impaired driver, even if they did not know Mr.

Williams was not legally licensed to drive. While Mr. Williams' behavioral tolerance to alcohol may have effectively masked the degree of his impairment, presumably the men were aware that Mr. Williams had been drinking, yet they still made the conscious decision to ride with Mr. Williams. Any injuries the men may have suffered in the collision were the result of Mr. Williams' actions, as well as their own decision to ride with him while he was impaired.

Dr. Dulaney reserves the right to amend or supplement his opinions should further information be discovered or become available.

    5.    Dr. Lawrence Line
            Southern Bone and Joint Specialists
            3688 Veterans Memorial Dr., Hattiesburg, MS 39401
            601-543-6400
            Designated Areas: Orthopeadic Medicine

Dr. Lawrence Line may be called by Defendants as an expert in field of Orthopeadic Medicine who may testify regarding the medical condition of each Plaintiff based on his independent medical review of their medical records. His CV/resume, fee schedule, testimony list, and publication list will be produced along with his signed expert report, all of which are incorporated herein by reference. The education, training and experience listed by Dr. Line in his CV/resume support his qualification as an expert. Defendants incorporate herein by reference his signed expert report for a complete statement of his opinions and basis for same.

Because Plaintiffs each failed to properly designate their non-retained/actor experts, as set forth in Defendants' Motion to Compel [150], Defendants' expert disclosure relative to Dr. Line is subject to revision and supplementation to address opinions that have not yet been designated by Plaintiffs, should the Court allow Plaintiffs to supplement and add opinions in lieu of excluding same. Additionally, because of the pending Motions to Compel [136], [138], [140], [142] seeking additional information, including medical information, Dr. Line's opinions are

subject to revision and supplementation should those motions be granted and additional information obtained.

Respectfully submitted, this 8th day of January, 2018.

                      ADOLFO PEREZ and D&D EXPRESS
                      TRANSPORT CORP

By: /s/ Kathryn Platt
      KATHRYN BREARD PLATT (#102141)
      CAROLAN D. LUNING (#105419)
      GALLOWAY, JOHNSON, TOMPKINS,
         BURR & SMITH
      2510 14th Street, Suite 910
      Gulfport, MS 39501
      Telephone: (228) 214-4250
      Facsimile: (228) 214-9650
      Email: kplatt@gallowaylawfirm.com
      Email: cluning@gallowaylawfirm.com
      *Attorneys for Defendants, Adolfo Perez and D&D Express Transport Corp*

**CERTIFICATE OF SERVICE**

I, Kathryn Breard Platt, one of the attorneys for Defendants, Adolfo Perez and D&D Express Transport Corp, do hereby certify that I have this date served the above and foregoing *Designation of Expert Witnesses* upon all counsel of record and interested persons via email only.

So certified, this 8th day of January, 2018.

                      /s/ Kathryn Platt
                      KATHRYN BREARD PLATT (#102141)