Excerpts from the Rough Trial Transcript
Dated September 28, 2018

Exhibit M

```
 1  analysis as well?
 2   A.  Yes, I did.
 3   Q.  What did you use?
 4   A.  I used a .05 because he would not have been on his brakes,
 5  so the deceleration rate would be low.  He would just be
 6  rolling or coasting to a stop.
 7   Q.  What did you use for Mr. Perez?
 8   A.  I used a .4.
 9   Q.  And can you explain why?
10   A.  Yes.  So there's been multiple studies done by Dr. Al
11  Dunn.  He's a professor at the University of Ohio State.  He
12  did a lot of study and research into loaded and unloaded
13  tractor-trailers and how they decelerate.  He come up with the
14  deceleration rate of .45 for most of your trucks that are
15  traveling down the road, and to take a range of that, and
16  because we did not know the exact condition of the brakes, take
17  a range of .4 to .5, and we took the lower of the range.
18   Q.  And why is that?
19   A.  Just because of the uncertainty and how the brakes --
20   Q.  The more conservative estimate?
21   A.  Yes.
22   Q.  Did you have any other final opinions based upon the speed
23  and deceleration of the Buick?
24   A.  Yes.
25   Q.  And what was that?
```

1   A. Based on the area of impact, Mr. Williams would not have
2   made it to the end of the bridge to his exit.
3           **MS. PLATT:** I tender the witness, Your Honor.
4           **THE COURT:** Cross-examination.
5           **MR. ROWAN:** Yes, sir.
6                     CROSS-EXAMINATION
7   BY MR. ROWAN:
8   Q. Good morning, Mr. Burgess. I met you for the first time a
9   couple of days ago?
10  A. Yep.
11  Q. Pleasure to meet you.
12  A. Yes, pleasure to meet you.
13  Q. Are all of your opinions consistent with the sworn
14  testimony of Adolfo Perez?
15  A. Yes. If you word it that way, yes.
16  Q. I want to make a couple of points clear because you're on
17  the other side. Weather this day was clear, no fog, no rain,
18  right?
19  A. Right.
20  Q. I just wanted to make that clear. You did a filament
21  test -- well, actually, you did the filament examination or the
22  analysis, excuse me.
23  A. Analysis.
24  Q. You weren't there when the filaments were photographed?
25  A. No.

55

```
 1   can tell that I'm closing quickly, to I can tell that that
 2   vehicle is stopped or nearly so, and I need to take all
 3   available measures to avoid the hazard.
 4       Q.  So when we get down to the next column, PRT -- what is PRT
 5   again?
 6       A.  Perception-response time.
 7       Q.  So what is that conclusion that you made with respect to
 8   PRT?
 9       A.  So perception-response time is a human trait.  So like Dr.
10   Dulaney mentioned, anything human, you need a range.  And
11   perception-response time in this case would range from about
12   2.1 seconds to about 2.8 seconds.  And at that 2.8 second mark,
13   we would expect a driver to be responding.  This also counts
14   air brake lag and the actual mechanical lags built into the
15   vehicle, particularly an air brake commercial vehicle.  We
16   expect there to be visible evidence of evasive action on the
17   road somewhere between 70 and 80 feet.
18       Q.  Is there a bell curve that you could draw to help further
19   explain this 85th percentile that you have here?
20       A.  Sure.  If I can figure out how to draw this correctly.
21       Q.  Let's see.  There we go.
22       A.  (Witness complies with request).
23       Q.  If you could just talk while you are drawing.
24       A.  Okay.  So like hitting a golf ball or being tall or short,
25   perception-response time is pretty normally distributed, what
```

1  we find in the big section of the bell curve, the 15th to 85th
2  response time for this, based on this research -- and it has
3  been redone several times, Maddox and Keifer just sort of
4  rehashed it in 2012 -- we found that drivers -- we would expect
5  drivers to respond between 148 feet before impact and 76 feet
6  before impact.  That's the part of the bell curve that most of
7  us fall into.
8  Q.  Okay.  Now, this process that you've described today, is
9  that commonly accepted methodology in your field of human
10 factors?
11 A.  It is.  This is a module in the software that Mr. Johnson
12 testified he has and has had.  It's part of the Northwestern
13 University human factors and accident reconstruction course.
14 I've taught it in teaching human factors for police officers.
15 This is part of the curriculum I teach as well.  It's been
16 published in numerous books, Dr. Paul Olson's Forensic Aspects
17 of Perception and Response, and a new book by Dr. Mark Green
18 that just came out last week.
19 Q.  Taking your methodology into consideration, what is your
20 opinion regarding Mr. Perez's performance in response to the
21 Buick?
22 A.  Mr. Perez's performance in response to the Buick falls
23 just within the normal part of the bell curve that most of us
24 are in.
25 Q.  So, as I understand it, are you saying -- what are you

```
 1  saying about that 85 percentile?
 2    A.  What I'm saying is that I can't be critical of his
 3  response.  He is in -- he is in the part of the bell curve with
 4  the rest of us.
 5    Q.  So 85 percent of us would respond the same?
 6    A.  In a same or similar manner.  There's our distribution.
 7  So we'd have 15 percent of the people we would expect to
 8  respond much later than Mr. Perez did.  We would have
 9  15 percent of the people who would do super well.  They are
10  athletes and pilots and people like that.  And then we have the
11  rest of us that would fall right in line with this
12  distribution.
13    Q.  I want to keep this on the screen and ask you a question
14  about the first photography showed Mr. Burgess, which is the
15  first photograph in defendant's exhibit two.  It's the first
16  police photograph that he took, and he testified he took it
17  from the point of impact looking forward.  How does that
18  photograph match up, or does it match up with what you are
19  saying here today?
20    A.  I think it matches up because we know that this -- that in
21  context with the rest of those photos, the truck needs 300 or
22  more feet to stop.  You look at the position of that truck,
23  it's not 300 feet away from the area of impact.  It's 160 feet
24  to the back of it and 75 more feet of truck.  It's consistent
25  with Trooper LaCap's deposition testimony that Mr. Burgess
```

1  Q.  And you said that Mr. Perez in his driving, in this wreck,
2  drove as 85 percent of the population of the U.S. would drive,
3  or the world?
4  A.  I think probably you would have to say the world because
5  parts of the research that went into our paper were done in
6  Australian, Finland and the United Kingdom.
7  Q.  So 85 percent, if we've got ten people in this room, or
8  whatever, that would be eight and a half of us, but if we had
9  ten people in a room, over eight people would have gotten into
10  a rear-end collision by those statistics?
11  A.  Assuming we are driving a truck that's got the
12  limitations -- so the SUV is able to steer out of the way.
13  That can steer left harder than a truck.  They're a little more
14  constrained and their braking distance is longer, but in terms
15  of our perception of the hazard and how we could see it and
16  when we would have this information, yeah, going back to Yansen
17  and Harvey in Denmark in the 1970s, when I was three, people
18  have this limitation.
19  Q.  So you disagree with Mr. Perez that if the taillights were
20  on, and the taillights were on, that he would have been able to
21  avoid the rear-ending the Buick?  You disagree with Mr. Perez?
22  A.  I do.  I think it is unlikely.
23  Q.  Well, he testified under oath, didn't he, that if the
24  Buick that you rear-ended would have had its taillights on,
25  would you have avoided this wreck, yes.

128

1   tire is.  It's just about smack dab in the middle of this lane.
2   The 18-wheeler is eight feet wide.  This lane, I believe, is
3   12 feet wide.  So if that's smack dab in the middle, that's at
4   four feet.  This 18-wheeler is over the line.  He said he
5   didn't try to swerve left, but that forensic evidence is not
6   lying right there.  There are only two photographs I can see
7   with any skid marks, and it's that one, and that one, real
8   blurry, that's the same one, and this one right here.  There's
9   a skid mark there, it is a little bit over to the right but it
10  is pretty close to the middle.  That's why at crime scenes they
11  take photographs, because they don't lie.
12       Why did Mr. McCon go to PT?  Anybody that has gone to PT,
13  and just about everybody has, knows how expensive that is, and
14  when you are not getting a paycheck, you are out of a job, you
15  can't afford to pay for your car, your housing, PT may fall by
16  the wayside.  That's just the way it is.  Just the same reason
17  why when the doctor said you're still hurt, you know, but Mr.
18  McCon says he wants to go back to work.  Well, he is hurting,
19  but guess what?  He's got to man up.  He's got to pay his
20  bills, support his family.
21       Next point.  Below minimum speed.  I wanted to object
22  during that because she is kind of making a halfway mention of
23  a statute, okay, you can't go below 40 on the interstate
24  statute.  If you go to that statute, it says except for if you
25  are having mechanical difficulty or becoming disabled.  Because

==if you are becoming disabled, I'm sorry, you may not be able to maintain 40 miles an hour. So that statute that she's referring to, it doesn't apply.== And the judge is the one that instructed you on the law. Did he instruct you on the law of that statute? It's in the paper.

Now, they criticize the plaintiff for not pulling over to the shoulder. That's what we should have done. But like many judges have told me, what is good for the goose is good for the gander. We didn't pull over to the shoulder -- not we, Mr. Williams, the driver. After this wreck, it's right here. Who else didn't pull over to the shoulder and stuck out in the road? That's call hypocrisy.

Now, at the end of the case, you are going to have this verdict form and I would like to kind of go through it with you. So it asks you do you find by a preponderance of the evidence that Adolfo Perez was negligent. We ask that you put yes, he was negligent. What do you determine the total amount of damages to be? We've got medical expenses too, but we just ask that you put the noneconomic damages right here. That's at your discretion, but we think it is worth that amount.

The third question is, do you find -- had is where the apportionment thing is. Do you find by a preponderance that Daryl Williams was negligent and that he proximately caused it. We believe he did the best that he could do, but if you think he was slightly negligent, then assign him zero to the

```
 1        (JURY OUT AT           )
 2        THE COURT:  Anything else on behalf of the plaintiff
 3   at this time?
 4        MR. ROWAN:  No, Your Honor.
 5        THE COURT:  Anything else on behalf of the
 6   defendants.
 7        MS. PLATT:  No, Your Honor.
 8        THE COURT:  Thank you all very much.  We will be in
 9   recess to await the verdict of the jury.
10        (RECESS TAKEN AT           UNTIL           ).
11        THE COURT:  First, let me take up the matter of a
12   question that was received from the jury during their
13   deliberations.  Let the record reflect that after the Court was
14   advised that a question had been brought out, the Court did
15   advise counsel for the plaintiff and counsel for the defendants
16   that there was a question.  And the question is:  Quote, what
17   does the percentage of fault decide?  Or determine?  Let the
18   record also reflect that after consultation with counsel, the
19   Court decided that the proper answer for the question was as
20   follows:  Ladies and gentlemen, you have been provided all of
21   the evidence and instructions on the law that you may properly
22   consider in arriving at your verdict.  Please continue your
23   deliberations.  Mr. Gunn, have I stated all of that correctly,
24   sir.
25        MR. GUNN:  Your Honor, Corban Gunn for the plaintiff.
```

1  Security Officer, please. The form of the verdict is in the
2  appropriate form. I'm going to ask that the clerk of the court
3  publish the verdict. Ladies and gentlemen of the jury, that
4  simply means she is going to read it. Listen very carefully to
5  what the clerk of the court roads. I want to be be sure that
6  is in fact your verdict.
7  **THE CLERK:** In the United States District Court for
8  the Southern District of Mississippi, southern drition,
9  Jametrius McCon versus Adolfo Perez and D & D Express
10 Transport, cause number 1:17cv77, special verdict form. Do you
11 find by a preponderance of the evidence that Adolfo Perez was
12 negligent and that this had negligence was a proximate cause of
13 the automobile accident in question? Yes. Question two. What
14 do you determine to be the total amount of damages incurred by
15 the plaintiff that was proximately caused by the accident in
16 question, for each of the following categories: Actual
17 economic damages, nothing. Noneconomic damages, 350,000.
18 Question three, do you find by a preponderance of the evidence
19 that Daryl Williams was negligent and that this negligence was
20 a proximate cause of the accident, automobile accident in
21 question? Yes. What percentage of fault, if any, do you
22 assign to each of the following in proximately causing the
23 accident in question? Fifty percent Adolfo Perez, 50 percent
24 Daryl Williams. Finalization of the verdict form signed this
25 date by the presiding juror, Stephen bonds.

```
 1        THE COURT:  Very well.  Anything else on behalf of
 2   the plaintiff at this time.
 3        MR. ROWAN:  No, Your Honor.
 4        MR. GUNN:  No, Your Honor.
 5        THE COURT:  Anything else on behalf of the
 6   defendants.
 7        MS. ALBERT:  No, Your Honor.
 8        THE COURT:  Ladies and gentlemen of the jury, I'm
 9   going to ask that you very briefly meet with me back in the
10   jury room before I finally let you go.  I release you from your
11   obligation about talking about the case.  You can talk with
12   anyone that you want to talk with about it.  You're not
13   required to talk.  It is entirely and completely up to you.
14   The reason I want to meet with you briefly is I do have some
15   certificates of appreciation from the Court for your service as
16   jurors here, and I also would like to ask you if you have any
17   comments regarding how you were treated, how we can make things
18   better for the next jury that comes along and any suggestions
19   you might make.  You know, we come here every day and we work
20   every day and we sort of get fixed in what we are doing and how
21   we do it, and some of the best suggestions that we have had in
22   a long time come from jurors such as yourself.  For example,
23   parking, we never gave my thought to how difficult it is for
24   jurors to park in the parking garage and avoid contact with
25   litigants.  It was a suggestion by a jury such as yourself that
```